# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| **GERALD LEE ARMSTRONG AND** | ) | |
| **ANDREA ARMSTRONG,** | ) | **Case No. 04-04320-TLM** |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | **MEMORANDUM OF DECISION** |
| | ) | |
| **CADLEWAY PROPERTIES, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Adv. No. 05-06021-TLM** |
| v. | ) | |
| | ) | |
| **GERALD LEE ARMSTRONG AND** | ) | |
| **ANDREA ARMSTRONG,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## INTRODUCTION

Cadleway Properties, Inc. ("Plaintiff"), the successor in interest to Merrill

Lynch Business Financial Services, Inc. ("Merrill Lynch"), brought this adversary

proceeding against Gerald Lee Armstrong ("Gerald") and Andrea Armstrong

("Andrea").[1]  *See* Adv. Doc. No. 1.[2]  The Armstrongs are the joint chapter 7

---

[1]  Use of Debtors' first names is for purposes of clarity only.

[2]  The complaint was filed on April 29, 2005.  The parties have stipulated it was timely under § 523(c)(1) and Fed. R. Bankr. P. 4004(a).  *See* Case No. 04-04320-TLM at Doc. No. 11, 12.

MEMORANDUM OF DECISION - 1

debtors in Case No. 04-04320-TLM filed December 3, 2004.[3]

Plaintiff abandoned its § 523(a)(2) cause of action prior to commencement of trial as to both the Armstrongs. *See* Adv. Doc. No. 20. And, at the close of the trial, Plaintiff voluntarily dismissed its § 523(a)(6) complaint as against Andrea. The cause remaining before the Court for decision is asserted solely against Gerald and solely under § 523(a)(6).[4]

The Court has considered carefully a large amount of evidence. This includes the parties' Stipulated Facts, Adv. Doc. No. 22; almost ninety Plaintiff's exhibits; fourteen Defendants' exhibits; an appraiser's affidavit, Adv. Doc. No. 21, stipulated into evidence; two depositions of Merrill Lynch employees admitted by agreement, *see* Adv. Doc. Nos. 23-26; and transcripts of Gerald's deposition and Rule 2004 examination published and used during trial. The evidence also includes Gerald's testimony over three days of trial.[5]

The Court has considered as well the several legal arguments the parties

---

[3] Debtors' discharge was entered in March 2005, and the chapter 7 trustee's no distribution report was filed in June, 2005.

[4] References are made to the Bankruptcy Code, Title 11, U.S. Code, as it existed prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 ("BAPCPA"). Debtors' petition and the initiation of the adversary proceeding preceded BAPCPA's effective date.

[5] It goes without saying that the Court has considered Gerald's credibility and the weight to be given his testimony. No similar ability to evaluate credibility existed with regard to the appraiser or the two Merrill Lynch employees testifying by deposition.

MEMORANDUM OF DECISION - 2

advance in light of that evidence.[6]  This Decision constitutes the Court's findings
of fact and conclusions of law.  Fed. R. Bankr. P. 7052.[7]

## BACKGROUND AND FACTS

### A.   Overview

#### 1.   Gerald and Armstrong Architects

Gerald obtained degrees in architecture in 1967 and 1968.  In addition, he
obtained an MBA in the late 1970's.  Gerald is licensed as an architect in Idaho
and four other states.  After working with other architectural firms, Gerald formed
his own firm, Armstrong Architects ("AA"), a professional association, in 1988.
AA was owned 100% by Gerald, and he was its president and responsible for its
operations and finances at all times relevant hereto.

#### 2.   Loans obtained by AA from Merrill Lynch

Ten years after its formation, in the fall of 1998, AA commenced a business
loan application process with Merrill Lynch.  In doing so, AA submitted financial
statements and the Armstrongs submitted a personal financial statement to support
Gerald's anticipated guaranty.  Exs. 6, 7, 80.  AA's statement as of July, 1998,
showed just under $1,000,000 in assets and a net worth of $426,593.00.  Ex. 7.[8]

---

[6]  *See* Adv. Doc. Nos. 30, 33, 34.  Collectively this post-trial briefing exceeds 150 pages.

[7]  The Court has jurisdiction, 28 U.S.C. § 1334(b), the matter is a core proceeding in
which this Court may enter a final decision, 28 U.S.C. § 157(a), (b)(1), (b)(2)(I), and venue is
proper, 28 U.S.C. § 1409(a).

[8]  This was an increase from the $358,136.00 in net worth on AA's December 31, 1997
(continued...)

MEMORANDUM OF DECISION - 3

AA received two loans from Merrill Lynch.  On October 7, 1998, AA obtained a $200,000.00 "reducing revolver" loan.[9]  It was used to satisfy a prior creditor, Syringa Bank.  It was to be repaid through monthly payments of interest and 1/36th of outstanding principal.  This loan matured on October 31, 2001.

This loan was secured by essentially all identifiable assets of AA, specifically including accounts, chattel paper, contract rights, inventory, equipment, fixtures, general intangibles, deposit accounts, documents and instruments, and also the proceeds of any collateral including proceeds in the form of accounts and insurance proceeds.  There was no security interest specifically taken, however, in any motor vehicles.

Also on October 7, 1998, AA entered into a second loan, essentially providing a business line of credit, in the maximum principal amount of $100,000.00.  AA was required to make monthly interest payments on this note, and the entirety of principal and any accrued and unpaid interest was due on October 31, 1999, the "initial maturity date."[10]  It was similarly secured by a blanket interest in AA assets.

Merrill Lynch filed a UCC-1 financing statement on October 20, 1998, to

---

[8](...continued)
balance sheet, Ex. 6.  The Armstrongs' personal financial statement showed assets of $2,036,540.00 and a net worth of $1,586,880.00.  Ex. 80.

[9]  The loan and security agreement explained this was similar to a conventional term loan but funded out of an accessible line of credit.  *See* Ex. 1 at 1.

[10]  The line of credit was renewable annually.  *See* Ex. 2.

MEMORANDUM OF DECISION - 4

perfect the security interest granted by AA.  Perfection was maintained through a

continuation statement filed in August, 2003.

      The security agreements prohibited AA from selling, transferring or

disposing of any identified collateral outside the ordinary course of its business.

Further, AA agreed not to make any material alterations to any tangible collateral

that might reduce or impair its value without Merrill Lynch's prior written

consent.

      AA also agreed to provide annual financial statements within 120 days of

the end of each fiscal year and to notify Merrill Lynch promptly of any material

adverse change in business or financial condition.

      Under the agreements and so long as AA was not in default, AA in the

ordinary course of its business could sell inventory, use or consume materials, and

collect and use all of its accounts.

      Gerald concurrently executed written guaranties of both loans.  The

guaranties provided, *inter alia*, that Gerald would have no "claim, remedy or right

of subrogation, reimbursement, exoneration, contribution, [or] indemnification"

against AA, or in any of Merrill Lynch's collateral, so long as there were

obligations owing by AA to Merrill Lynch.  *See* Exs. 3, 4.[11]

---

    [11]  The guaranties also stated that unless clearly noted otherwise "no material assets
shown on any financial statements of Guarantor heretofore or hereafter furnished to [Merrill
Lynch] are or will be held in an irrevocable trust, pension trust, retirement trust, IRA or other
trust or form of ownership exempt from attachment."  The guaranties further provided that

                                               (continued...)

MEMORANDUM OF DECISION - 5

### 3.        Defaults in payments, demands, and negotiations

AA defaulted on the monthly debt servicing obligations, commencing an extended period of demands for payment from Merrill Lynch, promises from AA that it would pay and explanations why it had not, proposed forbearance and modification agreements, and related negotiations. This process spanned from 1999 to 2004.[12]

AA apparently first failed to make certain of the required payments in late 1998 or early 1999.[13] In June 1999, Merrill Lynch sent a "demand notice" in regard to the revolver loan. Ex. 36. The demand notice referenced several prior "verbal agreements" on the obligations, and demanded prompt payment of $55,006.00 that was overlimit on the revolver loan, a copy of AA's 12/31/98 tax return, a copy of AA's first quarter 1999 internal financial statement, and a copy of AA's accounts receivable aging statement. It demanded performance within a week.[14]

---

[11](...continued)
"Guarantor will not hereafter transfer any material assets of Guarantor to any trust or third party if the effect thereof will be to cause such assets to be exempt from execution by creditors" excluding, however, "normal and reasonable contributions to pension plans and retirement plans."

[12] Gerald and the Merrill Lynch employees testified to these events. In addition, much of the history and chronology is based on Exhibit 37, contemporaneous records by Merrill Lynch of contacts with Gerald on behalf of AA.

[13] A proposed forbearance agreement in June, 2000, indicated that none of the required monthly payments on the revolver loan were ever made. *See* Ex. 38 at 3.

[14] This letter was authored by Michael DeNato, a Chicago, Illinois, portfolio manager for
(continued...)

MEMORANDUM OF DECISION - 6

Despite this quick deadline, the evidence does not indicate any further action on the demand regarding the AA defaults until the file was assigned to Raymond Abbott, a workout and collections officer of Merrill Lynch, in September, 1999.

Abbott commenced a process of telephone communications with Gerald, seeking to arrange for AA's cure of payments and provision of financial information.  On September 23, 1999, Abbott agreed to a 60 day "extension" based on Gerald's explanations and promises to pay.

In his fall, 1999, explanations for the lack of payments, Gerald advised Merrill Lynch that AA's business manager, Ron Petree, hired in August, 1998 had been found, in the summer of 1999, to be embezzling.[15]  Gerald contended Petree's embezzlement was a blow to AA's finances and to its business reputation, but that he was working on remedying the situation, including personally scrutinizing and monitoring all business and financial activity.  Later in September, Merrill Lynch advised that it would expect AA to pay over to Merrill Lynch insurance proceeds recovered by reason of the embezzlement, and Gerald responded that he thought that was a fair proposal and had no problem with it.

---

[14](...continued)
Merrill Lynch, and it was copied to three Merrill Lynch employees in Boise, Chicago and Salt Lake City, Utah.  None of these four employees testified.

[15]  Gerald advised Merrill Lynch, among other things, that this employee had continued to pay creditors other than Merrill Lynch, though Gerald had "no clue why" Merrill Lynch appeared to be singled out.

MEMORANDUM OF DECISION - 7

After a series of phone messages and promises of returned calls, Gerald in November, 1999, again advised Merrill Lynch that, once an accounting audit was finished, which he indicated should be soon, the matter could be submitted and insurance proceeds received, perhaps by Christmas of that year. Gerald also indicated that, by year's end, Merrill Lynch would be paid around $30,000.00 from some personal real estate being refinanced.

Gerald also indicated "a good chunk" of the insurance proceeds when received would be used to pay Merrill Lynch. In fact, $10,000.00 had already been received by AA on October 7, 1999, from the insurance company. Ex. 24 at 1.

After another round of unsuccessful attempts to connect by phone, Gerald in a mid-December call repeated the representations and promises.[16] He did not, however, disclose AA's receipt of another $18,283.67 in insurance proceeds on December 9. *Id.*

AA made some irregular payments to Merrill Lynch. On November 5, 1999, AA paid $1,404.82, and on November 30, another $12,772.07. Ex. 23 at 53.

Later, on December 23, 1999, Gerald advised that "Y2K" problems had interfered with AA finishing its promised financials, and that the accountant was

---

[16] This discussion also concerned the possible refinancing that would generate substantial amounts to apply to the loans. Merrill Lynch was told that refinancing had been delayed because that lender wanted financial information.

MEMORANDUM OF DECISION - 8

continuing work on the books.  On December 23, 1999, AA paid $30,254.09 to Merrill Lynch.  *Id.*

Even with these payments, AA was not in compliance with the loan obligations to Merrill Lynch, and a complete workout of the loans had not yet occurred.  On January 13, 2000, AA paid $20,005.00, Ex. 23 at 53, but this did not bring it current.

In February, 2000, Gerald again promised delivery of financial statements, and indicated additional payments would be coming, including some from the planned but delayed refinancing of certain personal real property.  He also indicated that AA's workflow and prospects had improved.  On February 29, AA paid $11,225.99.  Ex. 23 at 53.[17]

But by March, the refinancing had again stalled.  Gerald indicated to Merrill Lynch that the refinancing lender, like Merrill Lynch, wanted AA's current financials, which were not completed.

In May, 2000, with no payments since March 30, Merrill Lynch renewed its discussions with Gerald and AA about restructuring the loans.  A draft forbearance agreement was provided by Merrill Lynch.  It contemplated monthly payments of $9,000.00 by AA to reduce the loan balances, and contained other terms.  In late

---

[17]  Payments are found in Exhibit 23 (AA check register, 6/1/98 - 21/31/04).  Up to this point, the application of the payments to Merrill Lynch is not noted.  Thereafter, payments on the "loan" and the "line" were identified separately, as were payments to Merrill Lynch not on either loan but on AA's 401(k) plan.  *Id.* at 53-57.

MEMORANDUM OF DECISION - 9

May, Gerald advised that the monthly payment amount was more than AA could afford and that the forbearance agreement would need to reduce the cash servicing to $4,500.00 per month.  Though there had yet to be any financials provided with which that assertion could be evaluated, Abbott revised the draft agreement accordingly and sent it to AA on June 13, 2000.  Ex. 38.[18]

On June 20, AA paid $4,500.00, though no agreement had been signed.  In late June, Gerald indicated that he was still reviewing the agreement, and needed more time to finish financial statements required as a part of the forbearance process, though he also represented at the same time that AA was doing well.  A July payment of $4,500.00 was made.[19]

Gerald made similar representations concerning time needed to complete financials and finalize the agreement in August and in September, along with representations that AA's business was healthy and, in fact, was "rocking and rolling."  The financials were projected to be ready by the end of September.  Payments continued with $1,100.00 on the line in August, $4,500.00 on the revolver in each of September, October and November, and $1,700.00 on the line in November.  Ex. 23 at 53, 57.

As of December, 2000, Gerald still had not signed the agreement or

---

[18]  The agreement appeared to contemplate $4,500.00 payments on the revolver loan, and also payments to cover current accrued interest on the line of credit.  *Id.* at 5.

[19]  These are shown in the check register as payments on the loan.  Ex. 23 at 57.

MEMORANDUM OF DECISION - 10

provided the financials.  On December 6, Gerald promised them by the end of the month.  On December 29, $4,500.00 was paid on the loan and $1,600.00 on the line.  Ex. 23 at 53, 57.

Payments ceased in 2001.[20]  In April, 2001, Merrill Lynch complained that too much time had passed without a final deal, additional payments, or the required financial documents.  In reply, Gerald indicated that he had been hospitalized for several months with leukemia, but was now ready to return to work and address AA's business issues, including the Merrill Lynch debt.

There are obviously several gaps, some of significant duration, in the Merrill Lynch files from which this chronology is primarily based.  Additional and even larger gaps appear at this point.

Merrill Lynch's internal records show no contact or activity from April 19, 2001 to January 28, 2002.  Ex. 37 at 21-23.  The January 28 contact was evidently a voice mail message asking Gerald to call about the missing financials and lack of payments.  This contact appeared to generate a small $750.00 payment on the line and $1,000.00 on the loan on February 2, 2002.  Though there is no record of a subsequent follow-up by Merrill Lynch, similar $750.00 and $1,000.00 payments were made in April, 2002.  The April 22, 2002 payments were the last ever made.

The records contain a gap from the January 28, 2002 contact until October

---

[20] The check register shows no payments on either obligation through all of 2001.

MEMORANDUM OF DECISION - 11

7, 2002, when a similar message was left for Gerald. *Id.* at 24. The next contact

according to this record was several months later, on January 3 and 7, 2003. *Id.* at

25 (similar messages).

Abbott's testimony sheds no real light on what was transpiring. *See* Abbott

Dep. at 43-44, 53-55 (indicating Abbott was responsible for the file, and that he

could not recall if he assigned others to work on it or who those employees were if

he did).[21] Abbott indicated that his last contact with Gerald or AA was in January,

2003. *Id.* at 55. He indicated the file remained in his department, but he did not

know who was responsible for it. *Id.* at 55-56. He "guesses" that it was

reassigned. *Id.* at 56. There was no evidence presented that it was reassigned, or

to whom, or what contacts or communications took place throughout 2003 if any

at all.

One year later, in January, 2004, Merrill Lynch assigned the AA file to

Catherine Briick, a special handling account manager (and coincidentally the loan

underwriter in 1998 that initially procured AA's business). *See* Briick Dep. at 29.

She demanded financial information from AA, but received only a personal

financial statement for the Armstrongs and an indication from Gerald that AA was

---

[21] The testimony of Catherine Briick, another Merrill Lynch employee, adds nothing helpful regarding this period of time or how Merrill Lynch handled the AA accounts. *See* Briick Dep. at 29 (indicating Briick had no involvement with the loans between inception in 1998 and reassignment to her in January, 2004).

MEMORANDUM OF DECISION - 12

having trouble getting AA's statements prepared. *Id.* at 32-33; *see also* Ex. 79.[22]

Gerald indicated that AA could make payments of $1,300.00 per month. *Id.* at

33.[23] This was far less than the $4,500.00 figure discussed in the negotiations in

2000 and less than what was paid, briefly, that year. Briick indicated the proposal

was not acceptable. She referred the matter to counsel in early to mid-March after

Gerald has ceased returning her calls. *Id.* at 34-35.

### 4.    AA closes, suit is filed, and judgment obtained

AA ceased business and shut its doors on February 28, 2004.[24] Gerald sent

a letter to several of AA's creditors in March, 2004, indicating AA was out of

business, that there were no remaining assets nor funds with which it could pay

creditors, and that what few assets still existed were "collateral" to a creditor, an

apparent reference to Merrill Lynch, and were in storage for that creditor. Ex. 41.

On March 24, 2004, a complaint was filed by Merrill Lynch, and it was

served on Gerald and AA on March 27. Merrill Lynch sold to Cadleway all its

---

[22] Gerald testified that he also provided a business financial. This assertion was not corroborated, and was in fact impeached by Exhibit 79, the transmittal to Briick.

[23] Gerald's testimony indicated that this was to be composed of $800.00 per month on loan and $500.00 per month on the line.

[24] Gerald testimony indicated that the decision was made in January. Andrea obtained for Gerald an application for employment with Ada County. He completed it, and interviewed in February. Gerald testified that he wanted to keep AA's doors open after getting the job with the County but that the County viewed it as a conflict. That this was the reason the business was closed was not persuasive. There was no credible showing that Gerald could still run AA while employed elsewhere, or that the decision to close was based on anything other than AA's financial condition.

MEMORANDUM OF DECISION - 13

rights and interests in the loans in July.

On November 29, 2004, a default judgment was entered. The Armstrongs' petition in bankruptcy followed on December 3, 2004.

### B.    Transactions and conduct

Though material, this general chronology is not complete. The cause asserted again Gerald is not based solely upon AA's failure to repay the loans. Rather, Plaintiff argues that it or its property was wilfully and maliciously injured by Gerald during the course of these events. To evaluate this cause, further detail is required.

### 1.    1999 to 2001

Gerald testified AA's difficult financial conditions were initially caused by the Petree embezzlement in the 1998-1999 time frame, and that this embezzlement had lingering effects even after it was discovered. These effects in large part resulted, he says, from the need for AA to reconstruct its financial records given Petree's activities.

Gerald admits that he gave generally rosy business forecasts to Merrill Lynch in 2000, even though the oft-promised financials required by the loan documents were never provided. He also admits that AA never regained compliance with the payment obligations under the loans.

These difficulties were followed by Gerald's battle with leukemia in early 2001. Then, he further testified, the events of 9/11/01 severely impacted the

MEMORANDUM OF DECISION - 14

business.  Though details on how this occurred or was manifested were sketchy,

Gerald did testify the generally pessimistic and disrupted economic conditions that

followed 9/11 negatively impacted AA's business.  He focused on decisions of

AA's two largest clients, the State of Idaho and a large private real estate concern,

to limit their real estate construction and development businesses.

The financial statements developed by AA (though well after the fact)

corroborate the deteriorating condition.  At the end of 1999, a year and a half after

the loan was made, AA's net worth had fallen over $400,000.00 to $14,000.00.

*Compare* Ex. 8 *with* Ex. 7.[25]  In the year-end statements for 2000, net equity

rebounded to $116,117.00.  Ex. 9.[26]  But by the end of 2001, AA had a negative

net worth of $73,188.00.  Ex. 10.[27]

### 2.    2002

Business worsened in 2002.  The 2002 year-end balance sheet shows the

negative net worth had almost doubled, to $130,813.00.  Ex. 11.  Accounts

payable totaled approximately $173,000.00 with over $147,000.00 of that amount

being over 120 days.  Ex. 13 at 6, 7.  As noted, only $3,500.00 was paid to Merrill

---

[25]  In 1999, Merrill Lynch received a total of $44,430.98 in payments, all coming in
November and December.  *See* Ex. 23 at 53.

[26]  Merrill Lynch payments that year consisted of $31,230.99 (combined entries through
March 1, 2000), $4,400.00 (payments on the line from March 1 through December 31), and
$23,100.00 (payments on the loan March 1 to December 31).  Ex. 23 at 53, 57.

[27]  The 2001 year-end statement was apparently prepared in September, 2002.

MEMORANDUM OF DECISION - 15

Lynch in 2002.  *See* Ex. 23 at 53 ($1,500.00 on line), 57 ($2,000.00 on loan).[28]

The 2002 financial data was known to AA and Gerald in January, 2003.
*See* Ex. 11 (preparation date on 2002 financials).  He admitted at trial that the
figures were accurate.  Gerald and AA did not advise Merrill Lynch of the changes
in financial condition as required by the loan documents.  Gerald did not provide
the financials when they were generated.  He knew from the discussions from
1999 to 2002 that financial statements were required by Merrill Lynch for
consideration of any restructuring of the obligations.  He also knew the dismal
condition and prospects that those financials would show.

### 3.    2003

Merrill Lynch had evidently quit pressing AA for payment or the
documents.  Abbott's last contact on the accounts were telephone messages in
early January, 2003, and Merrill Lynch's files show no other contacts until Briick
communicated in 2004.

What happened during 2003 is drawn from Gerald's testimony and from
AA's financial records.[29]

Gerald testified that in April of 2003, AA downsized its operations and

---

[28]  Also as noted, Merrill Lynch shows only two contacts in 2002, occurring in January
and October.

[29]  In particular, events are based on or tied to Exhibit 23 (check register, June 1, 1998 -
December 31, 2004) and Exhibit 24 (cash receipts ledger for the same period).  *See also* Ex. 26
(cash receipts, 2003).

MEMORANDUM OF DECISION - 16

moved from 8th Street in Boise to a new location on Parkcenter Boulevard.  AA signed a 5 year lease on that property.[30]

Gerald testified that in June, 2003, he stopped taking salary from AA because the corporation could no longer afford the payroll tax liability thereon.[31] In lieu of salary, Gerald began receiving payments on his loans to the corporation.[32]  Over the course of the year, Gerald received $49,824.55 in such payments.[33]  At the same time as these payments were received, however, Gerald had even larger amounts owed to AA, shown on AA's books as a "stockholder receivable."[34]

On December 31, 2003, AA paid $6,053.90 in salary to Gerald, notwithstanding the change earlier that year from salary to loan repayments. Gerald explained that this was a payment "required" by his accountant to ensure

---

[30]  Though "downsized," the payments to the new landlord were higher.  Lease payments commencing April 24, 2003, were $3,297.00, apparently monthly, and previous payments were approximately $2,718.00.  *See* Ex. 23 at 4, 16.

[31]  *See* Ex. 23 at 30 (last "PY' [payroll] payment was on June 16, 2003, until a $6,053.90 payment on December 31, 2003 discussed further below).

[32]  Ex. 23 at 32 (payments commencing June 30).

[33]  Ex. 23 at 32 (reflecting $16,841.56 in loan repayments while salary was still being paid, and an additional $32,982.99 after payroll ceased).  Ex. 17 (a loan repayment summary) concludes the amount was $43,700.00 for the year, though it appears to round some figures and omit some smaller payments.

[34]  *See* Ex. 11 (12/31/02 balance sheet showing stockholder receivable was $57,965.00); Ex. 19 (stockholder receivable ledger through 12/31/01).  There was, however, a substantial "notes payable" to stockholder.  *See*, *e.g.*, Ex. 11 (liability of $407,877.00 on "note payable - stockholder").  There is no dispute that Gerald and Andrea had infused significant amounts into AA.  However, the issue in this lawsuit is not as simple as determining net contributions or net withdrawals.

MEMORANDUM OF DECISION - 17

Gerald had enough salary during the year to preserve the maximum retirement benefit. *See* Ex. 23; *see also* Ex. 22 (2003 W-2 to Gerald for $62,675.00 salary).[35] Also on December 31, 2003, AA made payments of $6,551.34 to its 401(k) plan, satisfying its employer contribution obligations.

Whether due to these year-end payments or otherwise, AA's bank account balance was negative on December 31. Ex. N at 1. And the 2003 year-end balance sheet would ultimately show a negative net worth of over $335,000.00. Ex. 12.[36] This reflected an increase in negative net worth of over $200,000.00 from 2002. *See* Ex. 11 (negative net worth of $130,813.00). Payables at the end of 2003 exceeded $212,000.00 with over $185,000.00 due more than 120 days. Ex. 14 at 6.[37]

Gerald knew in May, 2003, when AA's operations moved to Parkcenter Boulevard and in June, 2003, when he started to forgo salary and take loan repayments instead, that AA was in serious financial difficulty, and that it also owed several hundred thousand dollars to Merrill Lynch. The execution of the lease and the weight of the testimony indicate that Gerald anticipated AA could continue in business, but does not establish the reasonableness of that belief.

---

[35] Notwithstanding the W-2 assertions, the figures from Exhibit 23 are $26,281.06 in payroll, $16,841.56 in loan repayments while payroll was drawn, and $32,982.99 in loan repayments after payroll ceased (a total of $73,105.52).

[36] This balance sheet was apparently created in April, 2005.

[37] Additionally, these payables did not include the Merrill Lynch obligations, which were separately carried under "notes" payable rather than trade "accounts payable."

MEMORANDUM OF DECISION - 18

Even Gerald characterized what occurred that year as an unrelenting slide downward and, at least toward the latter part of 2003, he viewed circumstances as putting AA's business and the Armstrongs in a "survival mode."

Several of the distributions from AA at the end of 2003 have already been noted.  On the other side of the ledger, the documents reflect that in addition to AA's business income in late 2003, Gerald made loans to AA of $5,500.00 and $4,500.00 on November 26, 2003, and of $16,650.00 "on" December 31, 2003. Ex. 24 at 17.[38]

### 4.      2004

Things moved very rapidly in 2004.  As noted, Briick made demand the first month of the new year, and AA and Gerald were alerted to Merrill Lynch's renewed focus on the long unpaid loans.

AA made a number of extraordinary payments in the first three months of 2004.  These included payments of $5,365.46 to Andrea Armstrong.[39]  Gerald admitted they were out of the usual course of business, and several were not represented by invoices payable by AA.

Payments were also made to attorneys.[40]  Gerald indicated that he

---

[38]  As discussed *infra*, this date is taken from AA documents.  Bank records show the $16,650.00 loan was made January 23, 2004.  *See* Ex. N at 1.

[39]  From January 1 through closing of AA on February 28, Andrea received four payments totaling $5,130.00 and a March payment of $235.46.  Ex. 23 at 7-8.

[40]  *See* Ex. 23 at 21 ($1,494.95 in April and May, after the business closed).

MEMORANDUM OF DECISION - 19

anticipated a need for their services, both personally and perhaps for the

corporation.  Gerald caused AA's obligations to Qwest for telephone service to be

paid so as to ensure future personal service could be obtained.[41]  The IRS and

Idaho State Tax Commission were paid on outstanding obligations for which

Gerald believed he could, at least in part, be held personally responsible.[42]  Other

expenditures evidence Gerald's conscious decision as to which creditors would be

preferred and paid.[43]

And Gerald paid himself $573.12 on January 13, $993.45 on March 23, and

$5,408.29 on June 1.[44]

Finally, there were a number of transfers into the 401(k) plan, which were

to the benefit of Gerald as well as the other employees of AA.[45]  On December 31,

2003, $6,551.34 was transferred.  Ex. 23 at 57; Ex.33.  From January 1 through

the closing of AA on February 28, another $3,425.34 was transferred.  *Id.*  After

AA's closing, $22,722.86 was transferred from March 24 to May 4.  *Id.*

---

[41]  Payments to Qwest between January 1 and closing of the business totaled $1,047.13 and after closing in March and April another $1,015.40.  Ex. 23 at 62; Ex. 27 at 3-4.

[42]  The IRS was paid $21,031.13 on January 28.  Ex. 23 at 41; Ex. 27 at 3.  The ISTC was paid $1,550.00 before the business closed, and $456.00 after.  Ex. 23 at 39.

[43]  For example, Gerald caused AA to pay his personal automobile expenses.  *See* Ex. 34 ($484.45 in 2004 auto expense); Ex. 23 at 33 ($1,554.61 in payments to GMAC in 2004).

[44]  See Ex. 23 at 32.  The latter amount, according to testimony, was the balance in the account at the time it was closed.  Gerald's argument was that he had AA repay loans Gerald made to the business.

[45]  Gerald was the most highly compensated employee of AA and the one who benefitted most from the payments into the 401(k) plan.  Ex. 86.

MEMORANDUM OF DECISION - 20

There is no doubt that as of the end of 2003 the cessation of business was imminent, and that Gerald made ongoing conscious decisions about how AA's limited financial resources would be used and distributed. No payments whatsoever were made to Merrill Lynch. Given that Merrill Lynch renewed demands in early 2004, and rejected a rather small amount offered in restructured payments, Gerald had reason to know that Merrill Lynch would rely on its security interests and seek recourse to its collateral.

The business closed on February 28, 2004. Within three weeks, and coincidentally on the same date as the Merrill Lynch lawsuit was filed, AA sent letters signed by Gerald to several of its creditors which, in the process of asserting that no payments would be forthcoming, evidenced an understanding that there was a security interest and that all remaining assets were collateral. Ex. 41.

The key to this case, as discussed *infra*, is determining a point at which any arguably "innocent" or "technical" conversion of collateral became "willful" and "malicious" within the use of those terms in § 523(a)(6).

It is true that Merrill Lynch did not, at the time of any of its demands on AA for payment and financials, revoke AA's authority under the loan documents to continue to collect and use its accounts receivable.[46] In fact, AA continued in

---

[46] For example, the June 2000 draft forbearance agreement, Ex. 38, though reciting both maturity and default of the loans and noting Merrill Lynch's reservation and nonwaiver of

(continued...)

MEMORANDUM OF DECISION - 21

business for a substantial period of time after it was in default in 1998.  AA made

payments, though in irregular and insufficient amounts, to Merrill Lynch from

1999 through April 22, 2002.  Merrill Lynch essentially knew that AA was

collecting and using the accounts receivables during this entire period.  There was

no evident alternative source for the payments it received.[47]

It is also clear, however, that there had to come a time when Gerald knew

any implied authority from Merrill Lynch for AA's use of the accounts and

proceeds was no longer reasonable and legitimate.[48]  The Court finds that this was

clearly and unarguably true in 2004.  The dire financial condition was crystal clear

and the demise of the business was unavoidable.  Briick that month renewed

demands.  Gerald sought outside employment.  And he immediately began the

---

[46](...continued)
remedies, did not prohibit AA's use of accounts.  In fact, the agreement calls for provision of
account aging statements and work-in-progress reports along with the restructured payments.

[47] Gerald had indicated, periodically, to Merrill Lynch that he was attempting to
refinance personal real estate in order to make large, lump sum payments to Merrill Lynch or to
support a restructuring of the debt.  That refinancing never materialized.  Additionally, Gerald
continually reassured Merrill Lynch that AA's business was turning for the better, and AA made
sporadic though small payments to Merrill Lynch from its accounts. That these payments were
sourced in the collection of AA accounts receivable was evident, and Merrill Lynch knew that
AA continued to collect and use its accounts.

[48] Gerald attempted during testimony to suggest that he did not appreciate that
"accounts" as used in the loan documents included accounts receivable or that such accounts and
the cash proceeds thereof in the AA bank accounts ("deposit accounts") were just as much
collateral for the Merrill Lynch obligations as were furniture and equipment.  This testimony was
not credible.  Gerald's education, business experience and intelligence belie the idea that he
innocently collected and spent these AA trade accounts receivable thinking that Merrill Lynch's
collateral position was less then comprehensive.  His contention that he did not read or
understand the loan documents was also unpersuasive.

MEMORANDUM OF DECISION - 22

dismantling of AA and the dedication of its assets and funds to payment of numerous selected creditors other than Merrill Lynch. Any arguably reasonable belief on Gerald's part that Merrill Lynch would allow and authorize use of the accounts receivable and deposit accounts was negated by these developments.

The Court finds, from the totality of the evidence, that the line of cleavage is January 1, 2004. Before that date, Gerald had hoped that AA would survive, though the hope waned throughout the "survival mode" leading to year-end. He also had in 2003 an understanding that AA's use of accounts and their proceeds was authorized by Merrill Lynch. Merrill Lynch's own conduct in dealing with the account fostered this belief. Both aspects changed with the new year.

Plaintiff asserts, in effect if not specifically, that the cleavage line was earlier. The Court has evaluated the evidence, particularly that reflecting financial transactions in 2003, to determine if Gerald's ability to reasonably rely on Merrill Lynch's acquiescence to the use of accounts and account proceeds, and to advance a theory of innocent or technical conversion of collateral, ended earlier than January 1, 2004.

In 2003, Gerald made $39,650.00 in loans to AA. Of that amount, $26,650.00 was advanced in November and December.[49] Admittedly, during the same year, Gerald received $43,700.00 in payments from AA, thus taking out

---

[49] Ex. 24 at 15-17 reflects loans of $2,000.00 (3/20/03), $5,500.00 (5/30/03), $5,500.00 (6/2/03), $5,500.00 (11/26/03), $4,500.00 (11/26/03) and $16,650.00 ("12/31/03").

MEMORANDUM OF DECISION - 23

slightly in excess of what he put in.[50]  However, only $5,394.87 in loan

repayments, and the $6,053.90 in salary payment, occurred in those last two

months.[51]  These transactions, generally, are not necessarily indicative of an intent

to shutter the doors and cease the business.  While the $6,053.90 salary payment

does not jibe with the change from salary to loan repayment, and is out of the

ordinary, Gerald testified that it was made at the suggestion of the firm's

accountant in order to ensure his salary basis for the year for purposes of

retirement.  While this is a payment made in Gerald's self-interest, it does not

necessarily reflect that he at that time contemplated the closure of the business and

the diversion of Merrill Lynch collateral to other creditors or to the Armstrongs'

personal benefit.

In 2004, Gerald and Andrea made another $37,705.58 in loans to AA.[52]

However, that funds were infused in 2004 does not require the same conclusion as

with regard to 2003.  First, Merrill Lynch had in January renewed collection

activity and demands.  Second, AA's fate was clear and the actual closure of the

business was looming.  Third, much of the infusion was followed by payments by

---

[50]  Ex. 23 at 30, 31-32.

[51]  *Id.* at 30, 32.  The loan repayments were, from October 1 through November 17,
relatively regular (biweekly) and in roughly equal amounts ($2,200.00 per payment the first two
periods in October and $2,500.00 each on October 31 and November 17).  The December 3
payment of $2,500.00 follows the biweekly pattern and amount.

[52]  Ex. 24 at 17 (Gerald loans of $23,300.00 on January 28; $4,000.00 on February 5;
$2,000.00 on February 6; and $4,800.00 on March 1, and a loan from Andrea on January 6 of
$3,605.58).  As discussed below, another $16,650.00 was loaned on January 23.

MEMORANDUM OF DECISION - 24

AA to preferred and selected creditors.  For example, while Gerald loaned

$23,000.00 to AA on January 28, *see* Ex. 24 at 17, AA caused the IRS to be paid

$21,031.13 that same day, *see* Ex. 23 at 41.[53]

There is one important exception to this analysis of the line of cleavage.

The 2003 loans, according to Gerald and AA, included $16,650.00 purportedly

loaned "on" December 31, 2003.  A review of the AA bank account records,

Exhibit N, show that a deposit in this amount was actually made on January 23,

2004.  *Id.* at 1.  The Court will conclude, *infra*, that this amount, placed in AA's

accounts in 2004, should be included in the funds received and disbursed in 2004

and, thus, in the damages awarded under § 523(a)(6).  In short, the allegation that

this was a "2003" loan and preceded knowledge of the injury to be caused Merrill

Lynch is overcome by the timing of the actual advance, and it will be treated,

consistent with Exhibit N, as a "2004" advance.

**DISCUSSION AND DISPOSITION**

Plaintiff asks the Court to find and conclude "damages" in excess of

$390,000.00 are nondischargeable as to Gerald.  *See* Doc. No. 30 at 48; Doc. No.

34 at 45.  The sole legal basis asserted is § 523(a)(6) which excepts from

discharge "any debt . . . for willful and malicious injury by the debtor to another

entity or to the property of another entity."

---

[53]  Somewhat similarly, Andrea's January 6 loan of $3,605.58 was almost fully consumed
by payments from AA to Andrea on January 15 ($1,620.00) and January 22 ($1,560.00).

### A.    Elements of a § 523(a)(6) cause of action

#### 1.    The existence of a claim

The first requisite for a § 523(a)(6) cause of action is that the complaining plaintiff be a creditor, *i.e.*, actually have a claim against the debtors.[54]  This is driven by the language of the Code, which provides that a discharge "does not discharge an individual debtor from any *debt*."  *See* § 523(a)(6) (emphasis added).  "Debt" is defined by the Code as a "liability on a claim" and a "creditor" is an entity that has a "claim" against the debtor.  *See* §§ 101(5), (10), (12).

The evidence establishes a debt.  Gerald executed guaranties of AA's obligations, and a state court entered judgment against him.  He owes Plaintiff $305,095.19 as of November 29, 2004, plus post-judgment interest, fees and costs.  Thus, the threshold test is met.

However, just because there is a debt does not necessarily mean that all of it, or any particular portion of it, is nondischargeable.[55]  That question requires proof of additional elements, and is the whole point of this § 523(a)(6) action.

---

[54] *See Busseto Foods, Inc. v. Laizure (In re Laizure)*, ___ B.R. ___, 2006 WL 2615530 (9th Cir. BAP September 1, 2006); *Banks v. Gill Distribution Ctrs., Inc. (In re Banks),* 263 F.3d 862, 868 (9th Cir. 2001) (holding that "there are two distinct issues to consider in the dischargeability analysis: first, the establishment of the debt itself" and, second, the nature of the debt); *see also Purviance v. Region 1 Self Reliance Program (In re Purviance)*, 05.3 I.B.C.R. 68, 70 (Bankr. D. Idaho 2005).  If there is no debt owed, there is no point in evaluating the elements of nondischargeability.

[55] The damage amount requested by Plaintiff of $394,620.97, *see*, *e.g.*, Doc. No. 30 at 48, appears to be the state court judgment amount plus post-judgment interest.

MEMORANDUM OF DECISION - 26

## 2.      Proof of a willful and malicious injury

A creditor bringing a § 523(a)(6) action must prove all requisite elements for nondischargeability by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Spokane Ry. Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, 475, 00.4 I.B.C.R. 199, 200 (Bankr. D. Idaho 2000).

The determination of a "willful and malicious" injury requires a two-step analysis.  *Khaligh v. Hadaegh (In re Khaligh)*, 338 B.R. 817, 831 (9th Cir. BAP 2006).  The first step of the § 523(a)(6) inquiry is whether there was a "willful" injury.  *Id*.  As this Court recognized in *Dominguez v. Elias (In re Elias)*, 302 B.R. 900, 03.4 I.B.C.R. 243 (Bankr. D. Idaho 2003):

> To satisfy the willfulness prong, the creditor must prove that the debtor deliberately or intentionally injured the creditor, and that in doing so, the debtor intended the consequences of his act, not just the act itself. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). Elaborating on the debtor's state of mind required by the statute, the Ninth Circuit has explained that a debtor must possess a subjective motive to inflict injury, or believe that injury is substantially certain to result from his conduct.

302 B.R. at 907 (citing *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1143 (9th Cir. 2002)); *Khaligh*, 338 B.R. at 831 (following *Su*).[56]  *Elias* further recognized that

---

[56]  For purposes of § 523(a)(6), a debtor must have had the subjective intent to cause injury to the complaining creditor.  Plaintiff here, Cadleway Properties, Inc., acquired the interests of Merrill Lynch.  There rather obviously could be no specific intent of Debtor to injure *Cadleway* at the time of the various events and actions discussed in this Decision.  However, by virtue of Plaintiff's acquisition of Merrill Lynch's claims, it gains the right to assert any causes of action that belong to Merrill Lynch.  *See, e.g.*, *Bldg. Concepts LTD. v. Pickering*, 759 P.2d 931, 935 (Idaho Ct. App. 1988).  Thus, upon preponderating proof that Debtors had the intent to injure *Merrill Lynch* and acted with requisite malice, a § 523(a)(6) action lies for Cadleway.  While

(continued...)

MEMORANDUM OF DECISION - 27

the debtor's actual knowledge that harm to the creditor was substantially certain to result may be shown through circumstantial evidence of "what the debtor must have actually known when taking the injury-producing action." *Elias,* 302 B.R. at 907 (citing *Su*, 290 F.3d at 1146 n.6).

The second step of the § 523(a)(6) inquiry is whether the conduct was "malicious." *Khaligh*, 338 B.R. at 831. This requires (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) which is done without just cause or excuse. *Id.* (citing *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1105-06 (9th Cir. 2005), *cert. denied* 125 S.Ct. 2964 (2005)). It is the wrongful act which must be malicious; not the injury. *Sicroff*, 401 F.3d at 1106.

The willful and malicious prongs are analyzed separately. *Sicroff*, 401 F.3d at 1105-06. However, the "just cause or excuse" element of maliciousness presents a mixed question of law and fact. *Sicroff*, 401 F.3d at 1106. Evidence of specific intent to injure can negate just cause or excuse. *Khaligh*, 338 B.R. at 831 (analyzing *Sicroff*).[57]

---

[56](...continued)
Debtors alluded to this issue and the question of Plaintiff's standing, *see* Doc. No. 33 at 11-12, it provided no authority nor persuasive argument on the point.

[57] Plaintiff's briefing, *see* Doc. Nos. 30, 34, repeatedly advances the argument that proof of conduct that would qualify as a "fraudulent transfer" under Idaho statute suffices as proof of wilful and malicious injury under § 523(a)(6). It appears that Plaintiff's linkage of fraudulent transfers and § 523(a)(6) is based on *McCain Foods U.S.A., Inc. v. Shore (In re Shore)*, 305 B.R. 559 (Bankr. D. Kan. 2004). *See, e.g.*, Doc. No. 30 at 24-25. Plaintiff reads this case too broadly. The court was there considering whether a prebankruptcy judgment under a state fraudulent transfer statute provided a basis for a § 523(a)(6) judgment. However, that state court's judgment

(continued...)

MEMORANDUM OF DECISION - 28

### a.    Conversion as a willful and malicious injury

The issue of conversion of collateral as a willful and malicious injury to the property of a creditor is often litigated.  *See, e.g.*, *Del Bino v. Bailey (In re Bailey)*, 197 F.3d 997, 1000 (9th Cir. 1999) (recognizing conversion of another's property, done intentionally and without excuse, to the other's injury, constitutes a willful and malicious injury within the meaning of § 523(a)(6), citing *Transamerica Comm. Fin. Corp. v. Littleton*, 942 F.2d 551, 554 (9th Cir. 1994)).

*Endicott* was such a case of conversion allegedly transgressing § 523(a)(6).  Though this Court issued its decision in *Endicott* prior to *Elias* and *Su*, its articulation of the standard for proving a § 523(a)(6) claim is consistent with those later cases.  And *Endicott* directly addressed the issues presented in advancing such a claim on the basis of an alleged conversion:

> [A] creditor must show that a debtor, when converting collateral, did so with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion.  This subjective test focuses on whether the injury was in fact anticipated by the debtor and thus insulates the innocent collateral conversions from non-dischargeability under § 523(a)(6).

----

[57](...continued)
also found (in connection with a claim for punitive damages) that the debtor acted toward the creditor "with willful conduct" as well as fraud.  *Id.* at 564.  The bankruptcy court analyzed the extensive factual findings of the state court and these additional aspects of the prebankruptcy record in evaluating the assertion that there was a prior finding and conclusion equivalent to proof of an intent to harm or injure.  *Id.* at 566.  It is inaccurate to view *Shore* as a general validation of the proposition that proof of a fraudulent transfer under state law will necessarily be sufficient to establish willful and malicious injury under § 523(a)(6).  *See id.* at 568-70 (addressing differences between its case and *Quarre' v. Saylor (In re Saylor)*, 178 B.R. 209 (9th Cir. BAP 1995), which found avoidance of fraudulent transfer, standing alone, does not mandate a § 523(a)(6) finding)).

MEMORANDUM OF DECISION - 29

*Endicott*, 254 B.R. at 478.  Or, as stated from the debtor's point of view:

> Essentially, for a conversion to be dischargeable it must be done innocently in the honest but mistaken belief that authority to sell or use the collateral exists, which the Court labeled a "technical" conversion.

*Thiara v. Spycher Bros. (In re Thiara)*, 285 B.R. 420, 430 (9th Cir. BAP 2002)

(citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934)).[58]

Deciding whether a debtor has engaged in an "innocent collateral conversion" must be done on a case-by-case basis.  *Endicott*, 254 B.R. at 478 (citing *AVCO Fin. Servs. v. Kidd (In re Kidd)*, 219 B.R. 278, 284 (Bankr. D. Mont. 1998)).  *See also Peklar v. Ikerd (In re Peklar)*, 260 F.3d 1035 (9th Cir. 2001) (finding debt arising from a "negligent" or "technical" conversion dischargeable, where debtor relied on advice of attorney to remove property from leased space).

*Endicott*, *Kidd*, *Thiara* and *Peklar*, among a host of like cases, support the basic premise that intent matters.  Given *Geiger*'s articulation of the § 523(a)(6) standard and focus on a debtor's intent to cause injury, this is not surprising.  In short, if the conversion of collateral is done through an honest but erroneous belief there is authority to sell or dispose of collateral and use the proceeds, even if such

---

[58] In *Davis*, the Supreme Court held that malice is lacking where there is an "honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed."  293 U.S. at 332.  In numerous § 523(a)(6) cases, this authority has led to an analysis of the *creditor's* conduct and course of dealing with its debtor as it relates to a *debtor's* knowledge, belief and intent when taking actions constituting a conversion, in order to determine if that conversion should also be found willful and malicious.

MEMORANDUM OF DECISION - 30

conduct can be viewed as negligent, unreasonable or reckless, the resultant

liability to the secured creditor is dischargeable under § 523(a)(6) because the

requisite intent to cause injury is lacking.

### b.    Distinguishing between Gerald and AA

Plaintiff's Article 9 debtor and primary obligor was AA.  A claim for wilful

and malicious injury to collateral is ordinarily (though as will be seen not

invariably) asserted against the Article 9 debtor.  Here, AA is not in bankruptcy.

And, if it were, it would not be entitled to a discharge in any event.  *See*

§ 727(a)(1).

The issue presented is whether Gerald, not just a guarantor of AA's debt

but also the sole shareholder of AA and the officer and director in charge of AA's

business affairs, committed a willful and malicious injury to Plaintiff's property

within reach of § 523(a)(6).

"While bankruptcy law governs whether a claim is nondischargeable under

§ 523(a)(6), [the] court looks to state law to determine whether an act falls within

the tort of conversion."  *Bailey*, 197 F.3d at 1000 (citing *Saylor*, 178 B.R. at 214);

*see also Farmers & Merchs. State Bank v. Cracchiolo (In re Cracchiolo)*, No. 99-

6268, 2000 WL 33712222, *6, 00.2 I.B.C.R. 84, 87 (Bankr. D. Idaho 2000).

Under Idaho state law, a conversion requires " an act of dominion wrongfully

asserted over another's personal property in denial of or inconsistent with rights

therein."  *Cracchiolo*, 2000 WL 33712222 at *6, 00.2 I.B.C.R. at 87 (quoting

MEMORANDUM OF DECISION - 31

*Peasley Transfer & Storage Co. v. Smith*, 979 P.2d 605, 616 (Idaho 1999)).

It is thus possible, under applicable state law, for a party other than the Article 9 debtor to commit a conversion of the secured creditor's collateral. Under Idaho law, any party who knowingly and wrongfully exerts control and dominion over the property of another can be liable for conversion. It is not inevitably required that it be a Article 9 debtor who invades the property interests of the Article 9 creditor.

Additionally, there is a substantial body of case law recognizing § 523(a)(6) liability for the owners, officers and directors of corporations when property secured to a creditor of that corporation is converted.

In *Mercantile Bank of Arkansas, N.A. v. Speers (In re Speers)*, 244 B.R. 142 (Bankr. E.D. Ark. 2000), the court considered the § 523(a)(6) liability of the debtor, who was the 100% owner and the president of Woody's RV Sales, Inc., a corporation that granted a security interest to the plaintiff bank. It stated:

> The Debtor's principal defense is that Woody's, Inc. is the entity that is guilty of the conversion and because the Debtor was acting in the furtherance of the corporation's business, only Woody's, Inc. is liable to the Bank. This defense overlooks the significant principle of corporate law that officers and directors of corporations are personally liable to the extent that their tortious acts result in harm to a third party.

> In the context of bankruptcy, an individual debtor who is an officer of a corporation and who actively participates in the conversion of property subject to the security interest of a third party becomes personally liable to the third party such that the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

MEMORANDUM OF DECISION - 32

244 B.R. at 145-46 (citations omitted).

Among the several cases noted in *Speers* is that of *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556 (11th Cir. 1987). *Owens* considered at length whether the debtor, who was the president, director and majority stockholder of a car dealership, was personally liable for disposition of vehicle sales proceeds in contravention of a flooring agreement. 807 F.2d at 1559-60. It found that, although officers and directors are generally not liable for the debts of a corporation, "they are liable to the extent that their participation in the commission of a tortious act results in some harm to a third party and causes them to be liable to [that] third party." *Id.* at 1559.

*Owens* emphasizes several times that it is the conduct of the individual that is critical to the finding of personal liability. *Id.* at 1559-60.[59] Another recent case reaffirms this point:

> The critical factor in determining the corporate officer's personal liability and the dischargeability of the officer's obligation is whether there was personal involvement by the officer in the

_____

[59] "[A] personal debtor who, as an officer of a corporation, *actively participates in the conversion* of property which is subject to the security interest of a third party, is personally liable to said party and thus the debt is nondischargeable" under § 523(a)(6). *Id.* at 1559 (emphasis added). "The district court's ruling that Owens had *actively participated in the conversion* because he made the decision to dispose of the automobile and not to turn over the proceeds to FMCC is clearly supported by the evidence in the record. In so finding, the district court correctly held that Owens was not entitled to a discharge in his personal bankruptcy *because of his actions* as a majority stockholder and president of [the dealership] whereby he failed to comply with the essential terms of the floor plan." *Id.* (emphasis added). "Owens is personally liable for the resulting injury to FMCC because of his official capacity with [the dealership] *and his active participation in the conversion* of the property subject to FMCC's security interest." *Id.* at 1559-60 (emphasis added).

MEMORANDUM OF DECISION - 33

> improper disposition or conversion of the secured creditor's collateral. If personal involvement on the part of an officer is shown, and the officer's conduct is shown to involve a willful and malicious injury, then the resulting personal debt of the officer is nondischargeable under § 523(a)(6).

*Cmty. Sav. Bank, Inc. v. Roundtree (In re Roundtree)*, No. 01-2003, 2002 WL 832669, *7 (Bankr. M.D.N.C. May 1, 2002).

*Owens* warrants note because the Bankruptcy Appellate Panel for the Ninth Circuit expressly cited and applied it in *Andrews v. Manser (In re Manser)*, 99 B.R. 434, 436 (9th Cir. BAP 1989). In *Manser*, the debtor was the president and sole shareholder of Craftworks, Inc., to which several artisans supplied crafts on consignment and which failed to remit proceeds of sales in accord with the consignment agreements. *Id.* at 434-35. The Panel found evidentiary support for the bankruptcy court's determination that the debtor "was the sole person responsible for operation of the business and the payment for [the subject] debts" of the corporation. *Id.* at 436 (applying *Owens*, and denying discharge of debt under § 523(a)(6)).

The BAP subsequently applied *Owens* again in *Borg-Warner Acceptance Corp. v. Sharp (In re Sharp)*, 102 B.R. 764, 765-66 (9th Cir. BAP 1989), in upholding a § 523(a)(6) judgment against the president and general manager of a boat sale, rental and repair business. It noted that the debtor's "wrongful act was the misappropriation and conversion of [the plaintiff creditor's] funds by his failure to segregate and turn over said funds as required by the security

MEMORANDUM OF DECISION - 34

agreement" the business had granted plaintiff in inventory and proceeds of inventory. *Id.* at 765 (emphasis in original deleted).[60]

Other courts have reached similar conclusions. In *MemphisFirst Community Bank v. Rice (In re Rice)*, 308 B.R. 759 (Bankr. N.D. Miss. 2004), the individual debtor was the sole shareholder, officer and director of a corporation, and guarantor of the corporation's debts to the plaintiff bank. The Court found debtor "in his sole and individual capacity as control person of [the corporation]" moved accounts receivable and contracts to another similarly closely-held and controlled corporation for the purpose of avoiding the security interests of the bank. *Id.* at 760-61. The conduct was found willful and malicious and, thus, the resulting debt nondischargeable in the individual debtor's case. *Id.* at 762-63.[61]

And in *John Deere Co. v. Deresinski (In re Deresinski)*, 216 B.R. 995 (Bankr. M.D. Fla. 1998), the debtor was the president and sole shareholder of a corporate equipment dealer that had granted a security interest to John Deere in its inventory and in the proceeds of sale or rental of the inventory. The debtor had also guaranteed payment of the corporation's debt to John Deere. *Id.* at 997. The

---

[60] Both *Manser* and *Sharp* were decided under *Impulsora Del Territorio Sur v. Cecchini (In re Cecchini)*, 780 F.2d 1440 (9th Cir. 1986). While the *Cecchini*'s § 523(a)(6) test was effectively overruled by *Geiger*, the aspects of these BAP decisions regarding personal liability of corporate owners, officers and directors actively participating in conversion were unaffected and remain applicable.

[61] An evidentiary hearing was required to determine the magnitude of the injury, *i.e.*, "the precise amount of accounts receivable proceeds that were wrongfully diverted" by debtor. *Id.* at 763.

MEMORANDUM OF DECISION - 35

court found the debtor "was not only in control of [the corporation's] finances, but was constantly present at the dealership up until the close of the business" and lacked any good faith basis for failing to remit the sales proceeds as required by the agreement. *Id.* at 1001. In fact:

> The [debtor] was the president and sole shareholder of the dealership and during the eight year existence of the dealership was responsible for filling out final settlements as well as the accompanying checks. [Debtor] was essentially the only major player in the dealership and was completely accountable for its management.

*Id.* The personal conduct of the debtor established a willful and malicious conversion when certain items were sold and debtor "intentionally failed to remit the proceeds from those items to the plaintiff, knowing that economic injury to the plaintiff would result." *Id.* Consistent with that court's reliance on *Owens*, it found personal liability "due to his official capacity with [the dealership] *and his participation in the conversion of the proceeds*." *Id.* at 1002 (emphasis added).

The focus, therefore, is not on the relationship *per se* between the individual debtor and the corporation but, in addition and importantly, on the knowledge and intent of the debtor and whether he actively participated in a conversion under applicable law.

### c.    To what extent were Gerald's actions "willful and malicious"?

Gerald was the owner of AA, its managing officer and director, and personally handled its financial affairs. A conversion of Merrill Lynch's collateral

MEMORANDUM OF DECISION - 36

– primarily AA's accounts receivable and their proceeds, and AA's deposit

accounts – occurred.  Gerald personally participated in and directed that conduct.

What aspect or portion of that conversion was violative of § 523(a)(6)?

The case law instructs that all evidence indicating the nature of the debtor's

subjective intent to injure should be closely examined.  The case law also notes the

need for a court to consider direct and circumstantial evidence regarding the

debtor's conduct and, particularly, his or her intent.  Additionally, a creditor

plaintiff's actions or inactions may be relevant in determining whether that

plaintiff contributed to the debtor's "honest, but mistaken" belief that disposition

of secured collateral was authorized.  *See*, *e.g.*, *Endicott*, 254 B.R. at 479-80; *East

Idaho Fed. Credit Union v. Thomason ( In re Thomason)*, 225 B.R. 751, 753

(Bankr. D. Idaho 1998).

Gerald knew, commencing in 1998, of AA's loans with Merrill Lynch.  He

knew the specific agreements and documents that AA signed, and of the security

interest AA granted Merrill Lynch.[62]  However, the Court has found that through

2003, the use of the accounts and their proceeds, including the deposit accounts,

was implicitly authorized by Merrill Lynch.  Though it had advised AA and

Gerald of default, it did not demand surrender of the collateral or seek in any way

---

[62] One argument advanced, though without much vigor, is that Gerald did not read the
documents he signed for AA or those he signed personally.  The parties debate whether this is a
cognizable legal defense.  Regardless, it was not a credible factual defense under the entirety of
the evidence, including Gerald's education and experience and the level of his knowledge and
involvement in the operation of AA's business and finances.

MEMORANDUM OF DECISION - 37

to prohibit use of the collateral.  It did not advise AA or Gerald of any termination of authority to use accounts and assets.  By tolerating the absence of financial documents and full compliance with the loans, and accepting partial and sporadic payments from AA operations, Merrill Lynch reinforced the idea that AA could continue in business and continue using the collateral, including the accounts receivable and proceeds.  Over several years, this became "business as usual" for creditor and debtor, notwithstanding the default under the loans or the remedies available to Merrill Lynch had it only chosen to pursue and enforce them.

The facts thus support the proposition that Gerald acted in the "honest but mistaken" belief that AA could continue to use the collateralized assets, including accounts receivable, cash and deposit accounts, as it strived to stay afloat.

But by January 1, 2004, the situation changed.  The dismantling of AA commenced, and Gerald's diversion and dedication of the assets of AA to select and preferred creditors was not just a technical conversion but in knowing violation of the security agreements and related documents.  That Merrill Lynch would be injured was substantially certain.  The Court finds Gerald had the requisite intent to cause injury when he chose to pay himself, his wife, and creditors other than Merrill Lynch from Merrill Lynch's collateral and proceeds.[63]

---

[63] The active knowledge was established by the weight of the evidence as discussed at length above.  That knowledge was corroborated by the letters of March 24, 2004 that Gerald caused to be sent to several of AA's creditors, noting that all assets were collateral to a secured creditor.  Ex. 41.  Several of the 2004 transfers by Gerald were made *after* he signed and sent the

(continued...)

MEMORANDUM OF DECISION - 38

However, on a preponderance of the evidence, the Court cannot conclude that the same intent existed in 2003.  AA in 2003 certainly did, at Gerald's direction and with his knowledge, collect the accounts receivable and use those proceeds.  It also disposed of certain of Merrill Lynch's personal property collateral.[64]  The funds so generated went not to pay Merrill Lynch but, rather, to pay other creditors, and to pay Gerald and Andrea, and to enhance the 401(k) retirement plan.  But the evidence was insufficient to impeach Gerald's testimony that he still harbored hope of saving the business.  Even if such a hope was not objectively reasonable, the test under § 523(a)(6) focuses on Gerald's subjective intent.  Though conversion occurred, it was in the mistaken belief that continued use of accounts and other collateral in ongoing business operations was acceptable and not prohibited.  The belief was not just a construct in Gerald's mind, but flowed as well from Merrill Lynch's lackadaisical supervision and enforcement of its rights.  Recall that, under the evidence, there was no contact by Merrill Lynch from January, 2003 to Briick's renewed interest and demands in January, 2004.

---

[63](...continued)
letters.

[64]  The primary focus throughout has been on the AA accounts receivable collected and spent by AA, and the exhaustion of the deposit accounts.  Merrill Lynch also had security interests in furniture, fixtures and equipment.  Plaintiff made arguments concerning the disposition of equipment and furniture, pointing to tax depreciation schedules and related evidence of sale (or, as in the case of certain drafting tables, donation to a university program).  *See* Exs. 44 (2003 tax return), 46 (Oct. 2003 acknowledgment of donated goods), 47 (similar donation), 48 (2002 tax return).  These dispositions all occurred prior to 2004 and are not actionable under § 523(a)(6) as analyzed in this Decision.

MEMORANDUM OF DECISION - 39

But even Gerald knew that, as 2003 came to an end, the efforts during the "survival mode" had proven unsuccessful. The financial situation, including negative net worth and substantial aged accounts payable, and notwithstanding large personal loans over the years, was hopeless. The business would close. The conduct and efforts from the first of January, 2004 on were toward this end. In doing so, Gerald consciously chose to injure the collateral interest of Merrill Lynch in order to satisfy other creditors and the Armstrongs' personal interests. He knew that injury to Merrill Lynch was substantially certain to result.

### d.   What portion(s) of Plaintiff's claim falls within § 523(a)(6), *i.e.*, what are the damages?

It is not a given that because certain conduct transgresses § 523(a)(6) that any and all amounts owed the offended creditor are nondischargeable.[65] In asking the Court to enter a money judgment, Plaintiff inherently asks the Court to determine which portions of its claim are nondischargeable. That Plaintiff characterizes, in post-trial briefing, all the debt ensconced in its prebankruptcy

---

[65] As an example, though an exaggerated one for purposes of illustration, assume the debtor owes the creditor an unsecured debt of $1,000,000.00 net of the value of all surrendered and/or repossessed collateral. In surrendering collateral to the creditor, the debtor does not part with one item, a Mercedes Benz worth $50,000.00. The debtor falsely claims the vehicle had been stolen, and sells it for $50,000.00. The disposition is later discovered. The willful and malicious injury to creditor under this hypothetical, a conversion, relates solely to the vehicle. While there may be a judgment for the vehicle's $50,000.00 value under § 523(a)(6), there obviously should not be a § 523(a)(6) judgment for $1,000,000.00. *Accord ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 454-55 (Bankr. N.D. Ind. 2001) (holding that focus must be on the right that was invaded which, "in the conversion of collateral scenario . . . is not that the creditor's debt goes unpaid. The true injury is that the creditor's collateral was wrongly or improperly disposed of and that the proceeds were used for purposes other than payment of the obligation that property secured").

MEMORANDUM OF DECISION - 40

judgment as "damages" is not determinative.

The measure of damages for a conversion violating § 523(a)(6) is the value of the property converted or diverted. *Cracchiolo*, 2000 WL 33712222 at *7 (damages excepted from discharge as a result of debtor's conduct in converting property is equal to the value of the property on the date of conversion) (citing *Smith*, 979 P.2d at 615). *See also The Magic Lamp, LLC v. LeBlanc (In re LeBlanc)*, 346 B.R. 706, 714 (Bankr. M.D. La. 2006) (measure of damages is an amount equal to the injury caused by the debtor rather than any other sum owed by the debtor on contract; in regard to wrongful sale of encumbered property, it is the fair market value of the property when it was sold); *Heritage Bank of Central Illinois v. Vogel (In re Vogel)*, No. 04-8018, 2005 WL 3506443, at *9 (Bankr. C.D. Ill. Dec. 12, 2005) (appropriate measure of damages is "the value of the property that the creditor could have realized upon repossession at the date of conversion"); *Rice*, 308 B.R. at 763 (the measure of damages is the precise amount of the accounts receivable proceeds wrongfully diverted).

It was, unmistakably, Plaintiff's burden to prove damages from wrongful conversion of property and disposition of proceeds. A plaintiff

> "must not only show . . . his right of recovery, but the elements and facts which compose the measure of his recovery, and not leave the jury [or the Court] to rove without guide or compass through the limitless fields of conjecture and speculation." Bankruptcy courts have not hesitated to find a debt dischargeable where, even though wilful and malicious conduct is present, a creditor has failed to establish damages with some degree of certainty.

MEMORANDUM OF DECISION - 41

*Custom Heating & Air, Inc. v. Andress (In re Andress)*, 345 B.R. 358, 371-72

(Bankr. N.D. Okla. 2006) (citation and footnote omitted).

In this case, the Court concludes that Plaintiff carried its burden[66] and

established that the following property in which it had an interest was converted,

with requisite intent and lack of just cause or excuse.

### i.        Funds in AA's demand deposit account

On December 31, 2003, AA's bank account at bank of America was

overdrawn.  *See* Ex. N at 1.  The amounts thereafter deposited in 2004 to that

account total $145,401.15.[67]

These funds were collateral of Merrill Lynch.  Many were proceeds of

AA's accounts receivable.  That some of these deposits were from "loans" by

Gerald or Andrea changes slightly the analysis, but not the conclusion.  Once

funds were loaned, they became the assets of AA.  Merrill Lynch had a security

---

[66]  The manner in which Plaintiff approached the question of damages was excruciatingly detailed and at the same time often unhelpful.  The Court does not agree with several of Plaintiff's damage contentions.  It has, however, parsed the evidence and found the factual showing sufficient to support a damage award in the aspects set out below.

[67]  *See* Ex. N (Bank of America documents, acct. no. 25947912) at 1 (Jan. 2004 statement, deposits totaling $85,373.94, and including the $16,650.00 purportedly loaned on December 31, 2003 but actually advanced January 23, as discussed *supra* ); at 4-5 (Feb. 2004 statement, deposits totaling $19,736.88); at 6 (Mar. 2004 statement, deposits totaling $13,402.05); and at 8 (business checking activity online screen printout for April and May, 2004, reflecting a total of $26,888.28 in deposits).  The final activity screen printout, *id.* at 9-10, shows the checks written as the account moved toward closing in June, 2004.  Gerald testified that a final check was written to him on June 1, 2004 in the amount of $5,408.29.  *See also* Ex. 23 at 32. The last check on Exhibit N at 10 is in that amount and cleared June 3.  There appeared, from this report, to be $330.00 left in the account.  *Id.*

MEMORANDUM OF DECISION - 42

interest in all AA's contract rights, general intangibles, documents, instruments and, significantly, deposit accounts.  The amounts placed into the bank account were collateral.

The evidence is clear that all of the funds in the account were dissipated through payments to Gerald, Andrea, or creditors of AA or the Armstrongs other than Merrill Lynch.  Exhibit N establishes a competent and objective record[68] of the amount of the injury suffered by Merrill Lynch and the amount of damages proper under § 523(a)(6).[69]

### ii.    Other cash received and not deposited

Plaintiff argues that the $145,401.15 is not a fully accurate number, and that there was additional cash, also Merrill Lynch collateral, received in 2004 and not deposited into the bank account.  *See* Doc. No. 30 at 31 n.4.  The argument is premised on Exhibit 28, AA's cash receipts summary for 1/1/04 through 12/31/04. The relation between this summary and other evidence has created significant

---

[68]  The bank's record is found more probative and reliable than AA's records where there are inconsistencies between them.

[69]  Plaintiff made special points and arguments about the recipients of certain of the 2004 payments.  For example, it took exception to the fact that AA paid Andrea for amounts not substantiated by an invoice to AA, payments to Gerald in partial satisfaction of his loans, payments to lawyers, utilities, taxes, and so on.  However, since all such 2004 disbursements are from the account and from the $145,401.15 in 2004 deposits, no special analysis regarding the purpose of the payment or the identity of the recipient is required.  The key is that Merrill Lynch's collateral was collected and disbursed to creditors other than Merrill Lynch.  Certainly no additional award of damages is warranted in regard to any of these transfers, because the amounts are already included within the $145,401.15.

MEMORANDUM OF DECISION - 43

confusion in the arguments set out in the briefs.[70]

The Court generally views the records of AA as of secondary weight to the records of the bank that show what was in fact deposited and when. *See* Ex. N. However, Exhibit 28 does purport to be a register of cash receipts, and not all those receipts correspond to deposits found in Exhibit N. The following items noted on Exhibit 28 are at issue.

| | |
|---|---|
| 3/22/04 | Ron Petree ($994.00) |
| 4/1/04 | PA3-PCO-Canopies ($1,291.32) |
| ½/04 | Joan Prigge Residence ($991.67) |
| ½/04 | Rasmussen Cabin ($2,083.00) |
| 5/4/04 | Bonneville Blueprint ($122.75) |
| 5/4/04 | 4786, zurich ($1,325.90) |
| 5/27/04 | Shadow Hills Elem-Addition ($1,100.92). |

These seven entries total $7,909.56.

In reviewing these specific instances where Plaintiff believes AA collected receivables or other amounts and failed to deposit them in the business' account, the Court concludes that all but $122.75 were received and not deposited into the

_____

[70] Plaintiff states: "In addition [to Exhibit N], Exhibit 28 shows that there were seven entries for cash receipts that were received by Armstrong Architects which are not reflected in the Account Statements that total $7,909.56, increasing the total amount of cash received from January 1, 2004 through December 31, 2004 to $153,310.71." Doc. No. 30 at 31 (totaling the $145,401.15 amount and the $7,909.56 amount). Plaintiff claims Gerald willfully and maliciously converted that $153,310.71. *Id.* After seeing Defendant's rejoinder on the question, Doc. No. 33 at 36-38, Plaintiff revisits the question in its reply brief. Plaintiff states: "Defendant also goes into great detail to counter an alleged argument that Plaintiff contended there was $7,909.56 missing. . . . Plaintiff never made this argument. Instead, Plaintiff merely explained why the deposit number in the company's books needed to be increased by $7,909.56, based upon the bank account statements . . .." Doc. No. 34 at 34 n.12. Frankly, this rejoinder makes no sense given the nature of the evidence and the nature of the argument made in Plaintiff's opening brief. Plaintiff indeed argued that the $145,401.15 figure from the bank records should be increased by $7,909.56 in cash receipts AA indicated were also received in 2004, and that damages should be awarded for the full $153,310.71 amount.

MEMORANDUM OF DECISION - 44

business account discussed above, and thus should be added to the damages awarded.

Gerald notes that the $122.75 Bonneville Blueprint payment[71] on May 4, 2004, was in fact deposited into the AA account as part of a larger $14,949.06 deposit shown on Exhibit N that same date. This explanation is corroborated by both Exhibit N and Exhibit 28. Exhibit 28 shows cash receipts of $14,826.31 and $122.75 on May 4, 2004, and the combined total from these two receipts corresponds to the $14,949.06 deposit in Exhibit N. As such, the $122.75 identified by Plaintiff was already included in the $145,401.15 of 2004 funds collected.

Gerald admits receiving the Petree payment of $994.00, the "zurich" payment[72] of $1,325.90, and the Shadow Hills payment of $1,100.92. *See* Doc. No. 33 at 36-37. In fact, Exhibit 73, a summary of personal account check registers[73] shows the receipt. *See* Ex. 73 at 13 (entry of 3/22/04),[74] at 17 (entry of

---

[71] Gerald testified this was a refund of a prior overpayment.

[72] Gerald testified this was a partial refund of an errors and omissions (E&O) insurance overpayment.

[73] Exhibit 73 is a tabular restatement of the check registers of two accounts of Gerald's (at Bank of America and U.S. Bank) and one account of Andrea's. These reflect personal accounts rather than AA's business account.

[74] There is a $994.00 deposit shown on Exhibit 73 on March 22, 2004, bearing an entry reflecting that the $994.00 was a "Ron Petree" payment and that it was deposited in the personal account less $100.00 taken in cash. *Id.* at 13. Gerald effectively admitted it was received, and paid to him in partial satisfaction of his loans to AA. Gerald's other arguments regarding this payment were unconvincing.

MEMORANDUM OF DECISION - 45

4/24/04) and at 22 (entry of 6/3/04).[75]  The Court has been given no good reason to discount these documents showing that Gerald received and kept these three payments totaling $3,420.82 and that they did not go through the business' account.

Gerald argues that there is no affirmative proof that the Prigge, Rasmussen and PA#3-PCO receivables were ever actually paid, contending that the AA document showing them as received and "cleared" could mean they were written off or dealt with in some fashion other than payment.  That assumption is not supported by affirmative evidence, and is contradicted by the record of 2003 accounts receivable, Exhibit 82, showing these items, and Exhibit 28, AA's "cash receipts summary," showing them as received.  They will be added as well.

The amount of $7,786.81 ($7,909.56 less $122.75) will be added to the amount of nondischargeable § 523(a)(6) damages.

### iii.    Petree recoveries

Gerald admits in his post-trial briefing that the Petree restitution payments are collateral for Plaintiff, and "agrees that judgment can be entered against him determining that the net of $1,811.45 should be determined to be owed to Plaintiff and held non-dischargeable under 11 U.S.C. § 523(a)(6)."  Doc. No. 33 at 40.  That $1,811.45 figure is calculated by Gerald as comprised of $746.00 received on

---

[75] Gerald concedes that the latter two deposits, of $1,325.90 and $1,100.92, were kept by him and treated as repayments on his loans to the corporation.  Doc. No. 33 at 37.  *See also* Ex. 16 at 3 (summary of stockholder note payable, showing such repayments).

MEMORANDUM OF DECISION - 46

7/6/04, $498.00 on 9/6/04, and $498.00 on 11/5/04 (totaling $1,742.00), plus the $993.45 received on 3/23/04 and noted above in the Court's discussion of Exhibit N and Exhibit 28 (thus totaling $2,735.45).  *Id.*; *see also* Ex. 73 at 24, 32, and 36. Gerald reduces his admitted figure by deducting $924.00 in storage fees ($77.00 per month for 12 months) he paid to store AA's furniture and equipment that he agrees were and remain Plaintiff's collateral.

Since the $994.00 has already been awarded as part of the damages, *supra*, it would be incorrect to again include it here.  However, it is appropriate to add to the damage award the additional $1,742.00 Gerald admits was also received in 2004, retained personally, and not paid over to Plaintiff.[76]

### iv.    Other asset dispositions

Plaintiff complains that Gerald orchestrated and completed a number of other asset dispositions, and that they should be included in any damage award. Several of these occurred before 2004, and the Court has already determined that Plaintiff has failed to meet its burden of proof as to Gerald's intent at the time these transactions took place.[77]  Other dispositions of Gerald's personal assets took

---

[76] The argument of offset is addressed separately below.

[77] Plaintiff argued, for example, that a number of personally titled vehicles were carried on AA's financial statements, and on its tax records and depreciated.  (Some were even left on the tax schedules and continued to be depreciated long after they were sold).  Plaintiff claims that it was misled as to the magnitude of value of AA's assets by the vehicles' value being included on AA's balance sheets, though no § 523(a)(2)(B) or similar cause was tried.  Importantly, Plaintiff ignores the absence of any security interest to Merrill Lynch in any titled vehicles.  But these several issues are rendered moot by the pre-2004 timing of the dispositions.

MEMORANDUM OF DECISION - 47

place in 2004.[78]  However, in these regards, Plaintiff failed to prove it had a
security interest in any such property, thus defeating a cause under § 523(a)(6) for
injury to its property.[79]

In regard to deposit account, the cash receipts, and the Petree recoveries,
the Court concludes damages were established with sufficient particularity, and
the requirements of § 523(a)(6) were met.  Plaintiff's property interests were
wilfully and maliciously injured by Gerald and the damages therefrom total
$154,929.96, which figure is comprised of $145,401.15 in funds received into and
disbursed from the AA account, $7,786.81 in funds received outside the AA
account, and $1,742.00 in Petree restitution payments recovered personally and
not otherwise accounted for in the first two categories.

### e.    Offset

Gerald argues that any judgment for Plaintiff[80] should be reduced by
$984.00 representing twelve months of storage costs at $77.00 per month.[81]
Gerald made $77.00 payments to a storage facility starting in June, 2004, for space

---

[78]  For example, Gerald caused a personally owned Packard automobile to be sold in
May, 2004, for $27,900.00.  It was not part of Merrill Lynch's collateral.

[79]  Plaintiff argued that Gerald breached his guaranties by disposing of personal assets
and funneling the value of those assets into retirement accounts or other exempt assets.  Doc. No.
34 at 43-45.  That may be so, but it does not establish a cognizable claim in favor of Plaintiff
under § 523(a)(6) in the absence of an interest of Plaintiff in such personal assets.

[80]  Gerald admits a judgment under § 523(a)(6) is proper for the Petree receivables he
collected and retained after the business closed.

[81]  Doc. No. 33 at 39-40.

MEMORANDUM OF DECISION - 48

to store AA's equipment that was collateral for Merrill Lynch.  The payments

continued, Gerald testified, until June, 2005 when he moved that equipment into

his garage.  He says the equipment was finally picked up in March, 2006.

Plaintiff resists, noting that setoff was never raised in Defendant's answer.

This is correct.[82]  Federal Rule of Civil Procedure 8(c), incorporated here by

Federal Rule of Bankruptcy Procedure 7008, requires certain defenses to be

affirmatively pleaded.  Though setoff is not specifically listed in Rule 8(c), it

would appear to be a "matter constituting an avoidance or affirmative defense"

that the Rule requires to be pleaded.

More to the issue however, is that the Court in the instant decision is

determining the amount of a nondischargeable judgment.  That amount relates to

the value of property (collateral) converted by Gerald to his use and in injury of

Plaintiff's rights.  That judgment is based on collateral previously converted.  If

there is collateral remaining that was not converted, Plaintiff still has rights in it

and is entitled to realize on its value.  That such value might be net of costs of

realization (such as auctioneer expenses or – perhaps – storage charged by Gerald

or others) simply reduces the amount of recovery on the secured debt.  It has

nothing to do with Gerald's obligation to pay an unsecured, nondischargeable

debt.

---

[82]  The answer, Doc. No. 6, alludes to the storage of collateral, *id.* at 6 ¶ 26, and it sets
forth several affirmative defenses, but setoff is not among them.  *Id.* at 8.

MEMORANDUM OF DECISION - 49

Therefore, collection of additional Petree restitution installments, and sale of the remaining equipment or furniture, will generate funds applicable to the secured debt owed to Plaintiff, not the nondischargeable debt.  Similarly, *if* Gerald has a cognizable offset for storage costs, it can be addressed in the context of realization on that remaining collateral.[83]

The request for a $984.00 offset will be denied.

**CONCLUSION**

Plaintiff has established by a preponderance of the evidence that Gerald willfully and maliciously injured it, and judgment will be entered in the amount of $154,929.96.  All other claims will be dismissed.  Plaintiff may prepare a form of judgment accordingly.

DATED:  October 3, 2006

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

---

[83]  Under the circumstances, the Court declines to adjudicate whether an offset right exists or, if so, its amount.

MEMORANDUM OF DECISION - 50